1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                 FOR THE EASTERN DISTRICT OF CALIFORNIA

11   NORMAN GERALD DANIELS, III,

12              Petitioner,                    No. 2:04-cv-2337 FCD JFM (HC)

13        vs.

14   DERRAL G. ADAMS, Warden,

15              Respondent.                    FINDINGS AND RECOMMENDATIONS

16   _____/

17              Petitioner is a state prisoner proceeding in propria persona with an application for

18   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction

19   of two counts of murder and two counts of conspiracy to commit murder, and was sentenced to

20   fifty years to life in state prison.  (Lodged Doc. No. 1.)[1]  In his petition filed October 12, 2004

21   petitioner raised five claims that his prison sentence violates the Constitution.  This court found

22   three of petitioner's claims unexhausted.  (September 13, 2005 Order.)  Accordingly, this court

23   will address petitioner's two exhausted claims, claims numbered two and three, both of which

24   pertain to issues concerning petitioner's defense of duress.  (October 25, 2005 Order.)

25   _____

26        [1] "Lodged Doc." refers to documents lodged by respondent on March 29, 2005 and
     December 7, 2005.

1

PROCEDURAL BACKGROUND

1.  Petitioner was convicted on March 29, 2002 in Shasta County Superior Court, and was sentenced to 50 years to life in state prison.  (Lodged Doc. No. 1.)

2.  Petitioner filed a timely appeal in the California Court of Appeal, Third Appellate District, in case number C040856.  (Lodged Doc. No. 2.)  On September 29, 2003, the Court of Appeal affirmed the judgment.  (Lodged Doc. No. 5.)

3.  On November 3, 2003, petitioner filed a petition for review in the California Supreme Court in case number S120263.  (Lodged Doc. No. 6.)  On December 10, 2003, the California Supreme Court denied the petition for review.  (Lodged Doc. No. 7.)

4.  On October 27, 2004, petitioner filed the instant petition in the Central District of California.  The petition was transferred to the Eastern District of California on November 1, 2004.

FACTS[2]

   This case spins a bizarre and sad yarn.  It begins with a chance encounter between [petitioner] and Todd Garton, the mastermind of this tragedy, who now resides on death row.  It ends with the killing of Garton's wife, Carole, and her nearly full-term fetus, at the hands of [petitioner].  Aside from gun forensics and many exhibits , most of the evidence in this case came from [petitioner's] own mouth, primarily in the form of testimony from Garton's trial, and from two other witnesses at that trial–Dale Gordon and Lynn Noyes.

   The story unfolds in 1993, when [petitioner] and Garton met and became friends, sharing an interest in the military.  Garton regaled [petitioner] with his military exploits, and claimed to have worked as an assassin for the government.  Garton spoke of the easy life of an assassin, and asked [petitioner] if he was interested in such work.  [Petitioner] was not.

   [Petitioner] then moved, and he and Garton lost contact for about four years.  In the summer of 1997, the two resumed their acquaintance, [petitioner] having moved back into the area.  At this

_____

   [2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Norman Gerald Daniels, III</u>, No. C040856 (September 23, 2003), a copy of which was lodged on March 29, 2005.  (Lodged Doc. No. 3.)

point, [petitioner] was struggling financially, trying to support his wife, his young son and his wife's children from a previous marriage.

Garton again broached the subject with [petitioner] of working as a paid assassin.  Garton said he was still doing so, working with "Langley" (an apparent reference to the Central Intelligence Agency's Virginia headquarters) pursuant to an assassin network known as "The Company" (The Company or Company). Financially strapped, [petitioner] expressed interest.  Over the next few months, Garton spun more tales to [petitioner], including his history with the Irish Republic Army (IRA).

In February 1998, [petitioner] accompanied Garton and Dale Gordon to Oregon to carry out a planned killing of Dean Noyes. [Petitioner] was to be paid $1,000 for "watch[ing] [Garton's] back."  According to Garton, Dean Noyes was an embezzler who mistreated his wife; various non-Company "contracts" had been placed on him.  Garton also said that Noyes' wife, Lynn Noyes, was involved in the plan.  (Actually, Garton and Lynn Noyes were paramours.)  The "hit" on Dean Noyes was subsequently aborted due to logistical problems.

In April of 1998, Garton approached [petitioner] about another "hit," this one Company-ordered ad worth $25,000 to [petitioner]. Garton explained that [petitioner] would receive an instructional package specifying the target.  Because of his financial situation, [petitioner] agreed to do it.

With Garton supplying the money and [petitioner] the name, [petitioner] bought a .44-caliber revolver.  On the night of April 27, 1998, Garton gave [petitioner] an elaborately designed "hit package."  After [petitioner] had already opened the package seal, Garton warned him that if he opened the package, he would have to do as instructed or he would end up dead.

The package contained newspaper and magazine articles regarding IRA activities, a pager, and three photographs.  The target:  Garton's obviously pregnant wife, Carole.  The package instructed [petitioner] to activate the pager and provide the number to his recruiter (Garton), but not tell his recruiter the target's identity.  The package also warned [petitioner] that he could be "terminated" if he failed to complete his mission, which carried a "WO" (window of opportunity) from April 28 through May 20. Garton saw the photographs of the target, his wife.  He initially acted upset and sighed heavily, but resigned himself to the mission; in fact, Garton later reinforced the package's ominous warning by telling [petitioner] that if he did not carry out the hit, his son might be killed or kidnapped.  [Petitioner] activated the pager.

3

Garton surmised that Carole was targeted because she had switched sides in an IRA dispute and had shot and wounded a "Colonel Sean"– who was involved in the IRA and The Company. Garton informed [petitioner] that Lynn Noyes would be his "profiler"–that is, The Company's monitor and contact for the assassination.

[Petitioner] knew that Carole was pregnant and that if he killed her, he would also be killing her unborn child.  Still, he felt "corner[ed]."

Over the nearly three-week span leading up to the killings, [petitioner], Garton and Noyes communicated extensively, including via E-mail, regarding the dreadful task.  In these communications–which apparently included Garton playing the role of Colonel Sean–Garton and Noyes told [petitioner] that if he did not complete The Company's mission concerning Carole, he and/or his family would be killed.

Garton told [petitioner] that May 16, 1998, would be a good day to kill Carole because she would be home alone while Garton was working at a gun show.  [Petitioner] took the preceding week off from work to ensure he would be available when the opportunity arose.  [Petitioner] spent the night of May 15 in the Gartons' home. The next day, [petitioner] accompanied Garton to the gun show but later drove himself and Carole to the Gartons' residence after she stopped by the show following a visit to the hospital maternity ward.  As he drove to the Garton residence, [petitioner] thought about turning the opposite way and going to the police station.  On further reflection, though, [petitioner] thought such a move could make things even worse for his family.  If he went to the police, it would simply be his word against Garton's.  [Petitioner] decided to proceed to the Garton home and carry out the plan.

At the Gartons' residence, [petitioner] and Carole watched a rented movie.  Later, [petitioner] returned the movie to the video store while Carole went to lie down in her bedroom.  During his trip to and from the video store, [petitioner] thought about how he would enter the house and carry out the killing.

When [petitioner] returned to the Garton home, Carole was still lying on her bed.  [Petitioner] entered Carole's bedroom with the .44 revolver cocked in his pocket, and began conversing with her. Thinking it was "[n]ow or never," [petitioner] turned away so Carole would not see him removing the gun; then he whirled around and shot Carole in the head as she was looking at him. [Petitioner] fired twice more into her head and twice into her torso.

[Petitioner] paged Garton and E-mailed The Company about completing the assignment.  [Petitioner] did not really try to

/////

4

dispose of the gun or other evidence.  He was distraught, realizing he had just taken two lives.

[Petitioner] explained his role: "I had been repeating to myself since . . . I received th[e] package, I'm a dead man.  I knew that I was in trouble and I didn't see any way out.  These people – to me these people were real.  That, again, at any instant, I could end up dead."  [Petitioner] was also concerned about his family.  He acknowledged, however, that the threats were general and pertained to the possibility of future harm.  As he characterized the threats: "They were – the threat was general, that if I did not carry out, that it was a possibility that I or one of my family members would be harmed."  [Petitioner] became an assassin principally for the money, but he also admitted he found the idea intriguing.

(People v. Daniels, slip op. at 1-6.)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

1  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

2  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

3  simply because that court concludes in its independent judgment that the relevant state-court

4  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

5  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

6  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

7  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

8        The court looks to the last reasoned state court decision as the basis for the state

9  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

10  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

11  habeas court independently reviews the record "to determine whether the state court clearly erred

12  in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.

13  2000); accord Wilcox v. McGee, 241 F.3d 1242, 1245 (9th Cir. 2001).

14        AEDPA requires that this court give considerable deference to state court

15  decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).

16  Moreover, this court is bound by a state court's interpretation of its own laws.  Souch v. Schaivo,

17  289 F.3d 616, 621 (9th Cir. 2002), cert. denied, 537 U.S. 859 (2002), rehearing denied, 537 U.S.

18  1149 (2003).

19  II.  Petitioner's Claims

20      A.  Third Claim

21        Petitioner's third claim is that the California Supreme Court's holding that the

22  duress defense cannot be used in any murder trial was erroneous.  Petitioner appears to challenge

23  the California Supreme Court's holding in People v. Anderson, 28 Cal.4th 767, 772 (2002).[3]

24

25        [3] In People v. Anderson, the California Supreme Court held that duress is not an
    affirmative defense to the crime of murder.  Id. at 780.  The court recognized, however, that the
    circumstances of duress are relevant to a determination of premeditation, deliberation and

26  implied malice.  Id. at 780-84.

1    Petitioner also argues that the state court's application of <u>Bouie v. City of Columbia</u>, 378 U.S.

2    347, 354, 84 S.Ct. 1697 (1964)[4] to his direct appeal violated the Ex Post Facto Clause[5] and his

3    due process rights because the judgment in <u>People v. Anderson</u> was an unforeseeable

4    interpretation of Cal. Penal Code § 26.[6]

5               The California Supreme Court denied the petition for review without comment.

6    The California Court of Appeal noted that "the issue of duress played the key role in [the] trial

7    and apparently affected death penalty considerations here." <u>People v. Daniels</u>, slip op. at 8.  The

8    state court then applied <u>Bouie</u> to find <u>People v. Anderson</u> retroactively applied to petitioner's

9    direct appeal, holding that the duress defense was unavailable to petitioner. <u>Id.</u> at 11.

10              The California Supreme Court's rejection of the petition . . . is
                effectively an adjudication of the <u>Bouie</u> claim adverse to petitioner.
11              In order for a writ of habeas corpus to be granted here, petitioner
                must show that the California Supreme Court's adjudication was
12              contrary to, or an unreasonable application of, <u>Bouie</u>. See 28
                U.S.C. § 2254(d).
13

14   <u>Anderson v. Runnels</u>, 2008 WL 1849787 (N.D. Cal. 2008).

15              The state court's application of <u>People v. Anderson</u> to petitioner's case was not a

16   violation of the Ex Post Facto Clause or due process.  The United States Supreme Court has held

17   that an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates

18   _____

19         [4]  The <u>Bouie</u> court held that an unforeseeable judicial enlargement of a criminal statute,
     applied retroactively, is barred by the due process clause.  <u>Id.</u>

20
           [5]  Article I of the United States Constitution provides that neither Congress nor any state
21   shall pass an ex post facto law. U.S. Const. Art. I, § 9, cl. 3 and § 10, cl. 1; <u>Stogner v. California</u>,
     539 U.S. 607, 610, 123 S.Ct. 2446, 2449 (2003).  For practical purposes, the ex post facto clause
22   is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for
     criminal acts.'" <u>California Dep't of Corr. v. Morales</u>, 514 U.S. 499, 504, 115 S.Ct. 1597, 1601
23   (1995) (citations omitted).

24         [6]  California Penal Code § 26 provides, in pertinent part: "All persons are capable of
     committing crimes except those belonging to the following classes . . . [¶] Six – Persons (unless
25   the crime be punishable by death) who committed the act or made the omission charged under
     threats or menaces sufficient to show that they had reasonable cause to and did believe their lives
26   would be endangered if they refused."  <u>Id.</u>

like an *ex post facto* law and is a violation of due process.  Bouie v. City of Columbia, 378 U.S. 347, 354, 84 S.Ct. 1697 (1964).  "[A] criminal statute must give fair warning of the conduct that it makes a crime" and "[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect."  Id. at 350, 354 (internal citations omitted).

Since the filing of the instant petition, Mr. Anderson filed a petition for writ of habeas corpus challenging the California Supreme Court's conclusion that duress is no defense to murder because it operates like an *ex post facto* law and is a violation of due process.  Anderson v. Runnels, 2008 WL 1849787 (N.D. Cal. 2008), citing Bouie, 378 U.S. at 353.  Mr. Anderson argued, as petitioner does here,

> that the California Supreme Court's interpretation of California law resulted in an unexpected and indefensible expansion of murder liability, that was applied retroactively to his case in violation of Bouie.

(Id. at *1.)

The Northern District Court analyzed California Penal Code § 26 and various California cases that addressed the defense of duress in different ways.  For example, the § 26 duress defense is not available in capital murder cases; while some courts suggest that unavailability does not foreclose its use in non-capital murder cases, others found the defense of duress unavailable for the crime of homicide.  Anderson v. Runnels, 2008 WL 1849787 at *2 [citations omitted].  Ultimately, the Northern District Court found that the California Supreme Court's holding in People v. Anderson "was not unexpected or indefensible."  Anderson v. Runnels, 2008 WL 1849787 at *3 citing see Bouie, 378 U.S. at 354.

> Because the law under section 26 was "inconclusive" at the time of petitioner's conviction, Anderson, 28 Cal.4th at 773, 122 Cal.Rptr.2d 587, 50 P.3d 368, the California Supreme Court did not violate Bouie by clarifying it. In United States v. Qualls, the Ninth Circuit concluded that where the circuits are split on the proper construction of a statute a change in the law is foreseeable, and due process does not bar retroactive application of a judicial expansion of that law. United States v. Qualls, 172 F.3d 1136, 1139 n1 (9th Cir1999); see also United States v. Rodgers, 466 U.S.

475, 484, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) (holding that a change in the law is foreseeable when circuits are split on the proper construction of a statute). Similarly, in <u>Moore v. Rowland</u>, the Ninth Circuit held that where California courts were divided as to the appropriate test of whether a felony was a predicate offense for second-degree felony murder, retroactive application of a California Supreme Court decision identifying the correct test was foreseeable and did not violate due process. <u>Moore v. Rowland</u>, 367 F.3d 1199, 1200 (9th Cir.2004).

<u>Anderson v. Runnels</u>, 2008 WL 1849787 at *4;[7] <u>see also</u> <u>Reay v. Scribner</u>, 2008 WL 162600 (E.D. Cal. 2008) (<u>People v. Anderson</u>, 28 Cal.4th 767, 122 Cal.Rptr.2d 587(2002) is retroactive.)[8]

This court adopts the reasoning of <u>Anderson v. Runnels</u>, 2008 WL 1849787, and finds the California Supreme Court's denial of the petition for review was not an unreasonable application of <u>Bouie</u>. <u>See</u> 28 U.S.C. § 2254(d).[9]

For all of the above reasons, the state court's rejection of petitioner's third claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent. Petitioner's third claim for relief should be denied.

---

[7] Mr. Anderson did not appeal this order. <u>Anderson v. Runnels</u>, Case No. 3:04-cv-0149-VRW (N.D. Cal. 2008). A court may take judicial notice of court records. <u>See</u> <u>MGIC Indem. Co. v. Weisman</u>, 803 F.2d 500, 505 (9th Cir. 1986); <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980).

[8] <u>But see</u> <u>Tapia v. Roe</u>, 189 F.3d 1052 (9th Cir. 1999). While addressing an alleged error in a jury instruction on duress, which the court found harmless, the <u>Tapia</u> court stated, as dicta: "duress can excuse certain crimes, including murder without special circumstances. . . ." <u>Id.</u> at 1057. Because this decision was rendered after petitioner committed the murders, he could not have relied on <u>Tapia</u> to support his duress defense.

[9] However, even assuming, *arguendo*, that the state court's retroactive consideration of <u>People v. Anderson</u> was an unreasonable application of <u>Bouie</u>, constituting error under the § 2254(d)(1), this court would still be required to "review the substantive constitutionality of the state custody de novo." <u>See</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 737 (9th Cir. 2008)(en banc). The errors of state courts do not require that the habeas petition be granted in this court. In other words, even if § 2254(d)(1) error occurred, this court would be required to consider *de novo* whether the trial judge's consideration that petitioner had lawful alternatives available violated petitioner's due process rights. As will be explained below, that claim fails on the merits as well. Any error in finding <u>Anderson</u> retroactive was harmless beyond a reasonable doubt. <u>See</u> <u>Chapman v. California</u>, 386 U.S. 18 (1967).

B.  <u>Second Claim</u>

Petitioner's second claim is that the trial court erred by analyzing whether petitioner had any lawful alternatives to committing murder.  (Petition at 6-7.)  Petitioner argues that the trial court's use of the "no lawful alternatives" test was improper because that test applies only to a defense of necessity, not duress.  (<u>Id.</u>, October 29, 2003 Petition for Review [Lodged Doc. No. 6].)

The Court of Appeal found that petitioner was not entitled to the defense of duress under <u>People v. Anderson</u>, failing to address the merits of petitioner's second claim; thus, this court must perform an independent review of the record.  <u>Delgado</u>, <u>supra</u>.  However, because the state court's analysis of petitioner's alternative argument provides some overlap with petitioner's second claim here, the Court of Appeals' opinion is set forth below:

> [Petitioner] contends that even if *Anderson* applies retroactively, the trial court improperly assessed whether his duress negated "deliberation" so as to reduce the first degree murders to second degree.
>
> [Petitioner] claims the trial court improperly applied the concept of duress by incorporating the necessity defense's "no lawful alternatives" element into the duress defense.  [Petitioner] points to the following comments from the trial court regarding the duress defense:  " . . . I'm also impressed in this case by the amount of time available to [petitioner] to consider what was going on, to look for other avenues.  And the reality is, I carefully thought about the timeframe in this case during [petitioner's] trial.  And I am persuaded that [petitioner] not only had a great deal of time before he actually shot [Carole], but that he was not, at that point, at the end of his decisionmaking window.  That played a partial role in my decision that there was no legal duress involved.  He had other – he had more time available to him even at the time he did this crime to give it some more thought, to explore other avenues of how to get out of killing person, and he chose not to do it."  Along similar lines, the trial court later remarked that [petitioner] "had more time to come up with another alternative, or to decide simply to take [his] own chances."
>
> This improper legal assessment of the duress defense, [petitioner] argues, carried over to an improper assessment of duress and the issue of "deliberation."  [The court] disagrees for four reasons.

/////

First, although the defense of duress and necessity are legally different, they embody some parallels, including the general concept of lawful alternatives.  (See *People v. Heath* (1989) 207 Cal.App.3d 892, 900-901 (*Heath*); *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1164.)  At a basic level, the duress defense excuses a crime committed to avoid a greater, *immediate* threat, while the necessity defense excuses a crime committed to avoid a greater, *future* threat.  (*Heath, supra,* 207 Cal.App.3d at p. 901.)  Because of this, the necessity defense contemplates the availability of time to consider alternatives.  But the issue of alternatives is still a part of the duress equation.  As the decision in *Heath* correctly recognizes, "[a]n underlying premise common to both defenses [duress and necessity] is 'if there was a *reasonable, legal alternative* to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail.'"  (*Heath, supra,* 207 Cal.App.3d at p. 900, quoting *United States v. Bailey* (1980) 444 U.S. 394, 410 [62 L.Ed.2d 575], italics added; see also *People v. Galambos, supra,* 104 Cal.App.4th a p. 1164.)  Because the defenses of duress and necessity share this underlying premise of lawful alternatives, the trial court did not err merely by applying this premise in the duress context.  In fact, as the trial court perceptively observed along these lines:  "I don't think the availability of an earlier alternative which the [petitioner] did not avail himself of . . . would absolutely negate the application of the duress defense to an immediate, imminent, reasonably perceived threat that occurs thereafter.  That's my point.  [The legal principle that] there must have been no adequate alternative to the commission of the act . . . I believe that should be applied at the time of the act."  As the People also recognize, the imminency requirement of the duress defense and the "no lawful alternatives" element can be considered parallels.

Second, the trial court's comments regarding the substantial time available to [petitioner] to look for ways out and nevertheless his *choosing* not to do so, align with how the word "deliberate" is defined as to first degree murder.  In that context, "'[t]he word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"  (*People v. Goldbach* (1972) 27 Cal.App.3d 563, 569; CALJIC No. 8.20.)[10]  "The true

---

[10]  CALJIC 8.20 states:  "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.  [¶]  The word "willful," as used in this instruction, means intentional.  [¶]  The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.  [¶]  If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is

1    test is not the duration of time, but rather the extent of the
     reflection." (CALJIC No. 8.20.)  Duress contemplates a present,
2    immediate and imminent threat, but [petitioner] had weeks to
     reflect on the killings outside the immediate presence of the
3    threatening force. (*Otis, supra*, 174 Cal.App.2d at p. 125.)
     Moreover, [petitioner] concedes the killings were willful and
4    premeditated.

5         Third, the question of how duress affects the deliberation
     required for first degree murder is not a function of the legal
6    requirements of the duress defense, but rather the legal
     requirements of first degree murder. (*Anderson, supra*, 28 Cal.4th
7    at p. 784.) A killing under duress, like any killing, may or may not
     have been deliberated. If a person obeys an order to kill without
8    reflection, the trier of fact might find no deliberation and thus
     convict of second degree murder. (See *ibid.*; see also CALJIC No.
9    8.20.) This circumstance is not due to the special doctrine of
     duress, however, but to the legal requirements of premeditated first
10   degree murder, including the requirement that killing "'upon a
     sudden heat of passion or other condition precluding the idea of
11   deliberation'" does not constitute such murder. (*Anderson, supra*,
     28 Cal.4th at p. 784, italics omitted.) The trier of fact here, the trial
12   court, was presumably well-acquainted with the requirements of
     premeditated first degree murder. (See *ibid.*)

13
14        Finally, [petitioner] was not precluded from presenting an
     evidence of duress, and the trial court fully considered this claim as
     it was the pivotal issue at trial.

15

16   (People v. Daniels, slip op. at 11-15.)

17        "[F]ederal habeas corpus relief does not lie for errors of state law." <u>Lewis v.</u>

18   <u>Jeffers</u>, 497 U.S. 764, 780, 110 S.Ct. 3092 (1990). Thus, petitioner's challenge to the trial

19   court's use of the no lawful alternative test is a matter of state law for which habeas relief will

20   not lie.

21

22   murder of the first degree. [¶] The law does not undertake to measure in units of time the length
     of the period during which the thought must be pondered before it can ripen into an intent to kill
23   which is truly deliberate and premeditated. The time will vary with different individuals and
     under varying circumstances. [¶] The true test is not the duration of time, but rather the extent
24   of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of
     time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not
25   deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶]
     To constitute a deliberate and premeditated killing, the slayer must weigh and consider the
26   question of killing and the reasons for and against such a choice and, having in mind the
     consequences, [he] [she] decides to and does kill." <u>Id.</u>

1    However, even assuming petitioner had a due process right to present a defense of

2    duress, his claim would fail.  Criminal defendants have a constitutional right, implicit in the

3    Sixth Amendment, to present a defense; this right is "a fundamental element of due process of

4    law."  Washington v. Texas, 388 U.S. 14, 19 (1967).  "The right of an accused in a criminal trial

5    to due process is, in essence, the right to a fair opportunity to defend against the State's

6    accusations."  Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045 (1973).

7    Here, petitioner was not deprived of an opportunity to present a duress defense.

8    Petitioner does not claim he was prevented from raising the defense or precluded from admitting

9    any evidence in support of his defense.  Indeed, the record reflects that the trial court denied the

10   prosecution's motion to preclude the duress defense.  (RT 50-63.)  In ruling, the trial judge noted

11   the evaluation of this defense was fact-intensive and that even if there was evidence of lawful

12   alternatives, it would not necessarily negate the duress defense if petitioner could demonstrate he

13   had no alternatives at the time of the criminal act.  (RT 63-64.)  In addition, petitioner testified at

14   trial about his state of mind in great detail.  (RT 267-68; 272-76; 290-99; 330-31.)  The issue of

15   duress was, as the state court put it, "pivotal" during petitioner's trial.

16   The trial judge rendered his verdicts on February 13, 2002, without explanation.

17   (RT 438.)  However, the comments the trial judge made after the guilty verdicts demonstrate that

18   he carefully considered the duress defense:

19           And I'm also impressed in this case by the amount of time
             available to [petitioner] to consider what was going on, to look for
20           other avenues.  And the reality is, I carefully thought about the
             timeframe in this case during [petitioner's] trial.  And I am
21           persuaded that [petitioner] not only had a great deal of time before
             he actually shot Mrs. Garton, but that he was not, at that point, at
22           the end of his decisionmaking window.  That played a partial role
             in my decision that there was no legal duress involved.  He had
23           other – he had more time available to him even at the time he did
             this crime to give it some more thought, to explore other avenues
24           of how to get out of killing this person, and he chose not to do it.

25   (RT 472, March 27, 2002 post-trial hearing.)  At the March 29, 2002 sentencing, the trial judge

26   confirmed he did not believe petitioner faced a reasonable threat of harm at the time petitioner

13

killed the victims:

> The first is motive.  And although, [petitioner], you may have been partially motivated, at least at the very end of this conspiracy, by fear and concern for your own personal safety and possibly that of your family, that perceived threat – and I [c]all it a perceived threat, because in this court's judgment it wasn't reasonable but you perceived it as such, and it was a threat that was not in there.  I referenced that the other day.  And you had more time to come up with another alternative, or to decide simply to take your own chances.
>
> . . . .
>
> . . . You had the last opportunity of anybody, and an opportunity to exercise some humanity, and you chose not to.  You chose to go ahead with it.  And you indicated, as referenced by the probation officer's report, that after you fired the first shot, you realized what you were doing.  And your response was to fire four more times.

(RT 497-98.)  The fact that the trial judge did not accept the duress defense does not mean that petitioner was prevented from presenting it.

Second, the record reflects that the consideration by the trial court that petitioner had lawful alternatives available only "played a partial role in [the trial court's] decision that there was no legal duress involved."  (RT 472.)  This partial role does not mean that the trial court failed to consider the actual elements of duress as required under California law:  (1) where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged; and (2) if this person then actually believed that his life was so endangered.  (CALJIC 4.40.)  The trial judge's statements confirm his view that the threat was "perceived" and therefore unreasonable, and, because petitioner had time to consider lawful alternatives, the perceived threat was not "imminent."  It appears the trial judge found petitioner had an actual belief his life was endangered, but did not find the threat would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged.  (RT 427; 497-99.)

/////

/////

Third, the United States Supreme Court has stated that:

> We need not speculate now, however, on the precise contours of
> whatever defenses of duress or necessity are available against
> charges brought under § 751(a).  Under any definition of these
> defenses one principle remains constant: if there was a reasonable,
> legal alternative to violating the law, "a chance both to refuse to do
> the criminal act and also to avoid the threatened harm," the
> defenses will fail.  LaFave & Scott 379.[11]  Clearly, in the context of
> prison escape, the escapee is not entitled to claim a defense of
> duress or necessity unless and until he demonstrates that, given the
> imminence of the threat, violation of § 751(a) was his only
> reasonable alternative.  [Citations omitted.]

United States v. Bailey, 444 U.S. 394, 410-11, 100 S.Ct. 624 (1980).  This express holding by the

United States Supreme Court forecloses petitioner's constitutional challenge.

Fourth, under California law, the defense of duress requires that the threat to life

be imminent and immediate.  People v. Condley, 69 Cal.App.3d 999, 1012, 138 Cal.Rptr. 515,

cert. denied, 434 U.S. 988, 98 S.Ct. 619 (1977).  Federal courts have followed essentially the

same standard in federal cases in this circuit.  See United States v. Michelson, 559 F.2d 567, 569

(9th Cir.1977):

> "Coercion which will excuse the commission of a criminal act
> must be immediate and of such a nature as to induce a
> well-grounded apprehension of death or serious bodily injury if the
> act is not done. One who has full opportunity to avoid the act
> without danger of that kind cannot invoke the doctrine of
> coercion." United States v. Gordon, 526 F.2d 406, 407 (9th Cir.
> 1975), quoting Shannon v. United States, 76 F.2d 490, 493 (10th
> Cir. 1935).  Duress thus excuses a crime when another's unlawful
> threat of death or serious bodily injury reasonably causes the
> defendant to do a criminal act in a situation in which there was no

---

[11]  See also R. I. Recreation Center, Inc., v. Aetna Casualty & Surety Co., 177 F.2d 603,
605 (CA1 1949) (a person acting under a threat of death to his relatives was denied defense of
duress where he committed the crime even though he had an opportunity to contact the police);
People v. Richards, 269 Cal.App.2d 768, 75 Cal.Rptr. 597 (1969) (prisoner must resort to
administrative or judicial channels to remedy coercive prison conditions); Model Penal Code
§ 2.09(1) (actor must succumb to a force or threat that "a person of reasonable firmness in his
situation would have been unable to resist"); id., § 3.02(1) (actor must believe that commission
of crime is "necessary" to avoid a greater harm); Working Papers 277 (duress excuses criminal
conduct, "if at all, because given the circumstances other reasonable men must concede that they
too would not have been able to act otherwise").

1 other opportunity to avoid the threatened danger.[12] See also, <u>United</u>

2 <u>States v. McClain</u>, 531 F.2d 431 (9th Cir. 1976), <u>cert. denied</u>, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1977).

3 <u>United States v. Michelson</u>, 559 F.2d at 569.[13]   One California court has explained the

4 differences between the defenses of duress and necessity:

> "Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity." (<u>United States v. Bailey</u> (1980) 444 U.S. 394, 409-410 [62 L.Ed.2d 575, 590, 100 S.Ct. 624].) (2) An underlying premise common to both defenses is "if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." (<u>Id.</u> at p. 410 [62 L.Ed.2d at p. 591].)

15 <u>People v. Heath</u>, 207 Cal.App.3d 892, 899-900, 255 Cal.Rptr. 120 (1989); <u>see also</u> <u>People v.</u>

16 <u>Galambos</u>, 104 Cal.App.4th 1147 (2002)(citing <u>Bailey</u> with approval).

17  The United States Supreme Court has recently reiterated that under common law

18 the "burden of proving duress rests on the defendant," and, in dicta, stated that although it had

19 not previously set forth the elements of duress, it would "presume the accuracy of the District

20 Court's description" of the four elements of the defense, including that "the defendant had no

21 reasonable, legal alternative to violating the law, that is, a chance both to refuse to perform the

22 criminal act and also to avoid the threatened harm."  <u>Dixon v. United States</u>, 548 U.S. 1, 5 n.2,

23 /////

---

[12]   <u>See</u> generally, W. LaFave and A. Scott, Criminal Law at 375; Model Penal Code § 2.09(1).

[13]   The court used the terms "coercion" and "duress" interchangeably.  <u>Id.</u> at 569 n.3.

1  126 S.Ct. 2437 (2006)(interpreting federal statutes as requiring defendant to prove duress by a

2  preponderance of the evidence)(citing <u>Bailey</u> with approval).[14]

3          These authorities make clear that the consideration of reasonable, legal

4  alternatives to violating the law is an important consideration when evaluating a duress defense.

5  Petitioner has presented no authority for the proposition that employing the lawful alternative test

6  violates the Constitution.  Indeed, in light of the authority cited above, he cannot.

7          Finally, petitioner's claim that the trial court erred by considering the lawful

8  alternatives to committing the instant offenses fails on the merits.

9          As noted above, petitioner must demonstrate that he had an actual belief his life

10  was threatened and had reasonable cause for such belief.  <u>People v. Heath</u>, 207 Cal.App.3d 892,

11  900 (1989):

12

---

13          [14]  As noted by respondent, the <u>Dixon</u> court directly addressed the issue of which party
bears the burden of proof of the defense of duress.  (June 26, 2006 Letter Brief at 2.)  Recently
14  another court in this district addressed two related questions:  (1) whether the trial court's error in
applying the incorrect burden of proof was "structural error" necessitating automatic reversal of
15  his conviction; and (2) even assuming the error was subject to harmless-error analysis, whether
applying the necessity defense's "no legal alternative requirement" to his duress defense was
16  prejudicial error requiring reversal.  <u>Mounsaveng v. LaMarque</u>, 2007 WL 4328793 (E.D. Cal.
2007)(both parties had stipulated that constitutional error had occurred at trial).  The
17  <u>Mounsaveng</u> court found that applying the incorrect burden of proof was not structural error, but
was trial error and was subject to the standard of review set forth in <u>Chapman v. California</u>, 386
18  U.S. 18, 24 (1967)(constitutional error is harmless if the reviewing court is "able to declare a
belief that it was harmless beyond a reasonable doubt.")  The <u>Mounsaveng</u> court noted the state
19  court had applied <u>United States v. Bailey</u>, finding that the no lawful alternative prerequisite was
adopted by the California court in <u>People v. Heath</u>, 207 Cal.App.3d at 892, 900 (1989).  The state
20  court also found that the rule in <u>Bailey</u> was "the 'logical underpinning' of the duress defense, as a
defendant cannot have been responding to an immediate and imminent threat or acting without
21  the requisite mens rea if he chose not to take a reasonable, legal alternative to violating the law."
<u>Mounsaveng</u> at *12.  The <u>Mounsaveng</u> court then found that the court could not second-guess the
22  determinations of the state court as habeas corpus relief does not lie for errors of state law, and
that the claim also fails under federal law based on the United States Supreme Court's express
23  holding that "lack of a reasonable and legal alternative to violating the law to be a precondition
'under any definition of' duress."  <u>Mounsaveng</u> at *12, quoting <u>United States v. Bailey</u>, 444 U.S.
24  at 410.  Finally, the court found Mounsaveng's claim that he did not have lawful alternatives to
committing the charged crimes, even assuming <u>Heath</u> and <u>Bailey</u> applied, was without merit
25  based on the fact that the trial judge specifically found Mounsaveng had "ample opportunity to
alert authorities" and "long periods of time unaccompanied by" potential threatening persons.
26  <u>Mounsaveng</u> at *12.

Duress is an effective defense only when the actor responds to an immediate and imminent danger. "[A] fear of future harm to one's life does not relieve one of responsibility for the crimes he commits." (People v. Lewis (1963) 222 Cal.App.2d 136, 141 [35 Cal.Rptr. 1]; People v. Lo Cicero (1969) 71 Cal.2d 1186, 1191 [80 Cal.Rptr. 913, 459 P.2d 241].) The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. "The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea . . . ." (People v. Condley, supra, 69 Cal.App.3d 999, 1012.)

Heath, 207 Cal.App.3d at 900.  State courts applying Cal. Penal Code § 26 have stated:

In applying the foregoing section the courts have noted that "'The common characteristic of all the decisions upholding the excuse [of duress] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm." [Citations omitted.]  "'In order for duress or fear produced by threats or menace to be a valid, legal excuse for doing anything, which otherwise would be criminal, the act must have been done under such threats or menaces as show that the life of the person threatened or menaced was in danger, or that there was reasonable cause to believe and actual belief that there was such danger.'" (People v. Sanders, 82 Cal.App. 778, 785 [256 P.2d 251]; and see CALJIC No. 4.40.) To establish duress a defendant would have to show that he had (1) an actual belief his life was threatened and (2) a reasonable cause for such belief. Because of the immediacy requirement, a person committing a crime under duress has only the choice of imminent death or executing the requested crime. The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea and is liable for the crime. (See Pen. Code, § 31.)

People v. Condley, 69 Cal.App.3d at 1011-12.

In the instant action, petitioner's defense was that he feared members of "The Company" would kill him or kidnap his son if he did not kill Carole Garton.  (RT 418-20, 427-28.)  But the undisputed evidence at trial was that when petitioner shot the victims no one else was present at that time.  In addition, petitioner's "window of opportunity," expired May 20, 1998, four days before petitioner killed the victims.  Petitioner's own testimony confirmed his fear was based on some future harm:

| | | |
|---|---|---|
| 1<br>2 | PROSECUTOR: | You had heard some general threats that you or your family members would be killed.  That's what you were operating under, true? |
| 3 | PETITIONER: | Yes, sir. |
| 4<br>5 | PROSECUTOR: | And you had known that for at least a month – well, close to a month, ever since at least midnight of April 27th, true? |
| 6 | PETITIONER: | Yes. |
| 7<br>8 | PROSECUTOR: | But during the ensuing approximately three weeks from April 27th of 1998 up until May 16, 1998, nobody ever told you, we have got your son or wife and we're going to kill them if you don't follow through with the hit? |
| 9<br>10<br>11 | PETITIONER: | Nobody was kidnapped or threatened as – well, I should say kidnapped or being held against their will at that time, no, sir. They were – the threat was general, that if I did not carry [it] out, that it was a possibility that I or one of my family members would be harmed. |
| 12<br>13 | PROSECUTOR: | And this was a possibility in the future, that if you didn't carry it out, at some point in the future either you or a family member would be killed. |
| 14 | PETITIONER: | Yes. |

15 (RT 330-31.)

16      The prosecution emphasized in closing argument that petitioner failed to

17 demonstrate he feared imminent mortal harm when he killed the victims.  (RT 403-06.)  The

18 prosecution also argued that while petitioner drove the victims home from the gun show, he

19 considered going to the police to report the murder plot, but he decided against it.  (RT 404, 436-

20 37.)

21      As noted above, the trial judge did not explain his reasons at the time he rendered

22 his verdicts, but at two post-trial hearings, he stated that he had found petitioner "had a great deal

23 of time before he actually shot Mrs. Garton," and petitioner was not at the end of his assigned

24 window of opportunity for the "hit."  (RT 472.)  The trial judge noted petitioner had more time

25 "even at the time he did this crime to give it some more thought, to explore other avenues of how

26 to get out of killing this person, and he chose not to do it."  (RT 472.)  On March 29, 2002, at

1 sentencing, the trial judge noted that "after [petitioner] fired the first shot, [he] realized what [he]

2 was doing. And [his] response was to fire four more times." (RT 499.)

3         The record supports the trial judge's findings that the "perceived" threat was not

4 reasonable (RT 497) and that petitioner had a great deal of time to exercise lawful alternatives to

5 the murders. These facts demonstrate petitioner failed to meet the first prong of the duress

6 defense; that is, that a reasonable person would have feared for his life and that the danger was

7 imminent. Accordingly, this claim must also fail on the merits. See Gutierrez v. Griggs, 695

8 F.2d 1195, 1199 (9th Cir. 1983)(Gutierrez was not deprived of due process by the state court

9 evidentiary ruling where his own statement of facts reveals that he was not under duress at the

10 time of the killing); see also Mounsaveng v. LaMarque, 2007 WL 4328793 (E.D. Cal.

11 2007)(applying the necessity's defense's 'no legal alternative requirement" to duress defense was

12 not prejudicial error requiring reversal.)

13         After independent review of the record, for all of the above reasons, this court

14 finds that petitioner's second claim for relief should be denied.

15         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

16 writ of habeas corpus be denied.

17         These findings and recommendations are submitted to the United States District

18 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

19 days after being served with these findings and recommendations, any party may file written

20 objections with the court and serve a copy on all parties. Such a document should be captioned

21 "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

22 /////

23 /////

24 /////

25 /////

26 /////

1  failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED:  September 29, 2008.

UNITED STATES MAGISTRATE JUDGE

001; dani2337.157